IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA

v.                                               Case No.: 22-cr-55-jdp

DIDION MILLING, INC.

               Defendant.

---

### STATEMENT OF FACTS SUPPORTING PLEA AGREEMENT

---

      1.      This statement of facts is filed to establish a factual basis for the defendant's guilty plea as set forth in the plea agreement.

      2.      Defendant DIDION MILLING, INC. (DMI) operated a corn mill in Cambria, Wisconsin where DMI milled corn into flours and similar products, which DMI then sold and shipped to its customers for use in other products. The DMI corn mill suffered a catastrophic explosion on May 31, 2017, which prompted an Occupational Safety and Health Administration (OSHA) investigation.

      3.      DMI employed shift workers whose jobs included operating the milling equipment, packing equipment, and equipment used for loading products onto trucks and train cars. DMI also employed "shift superintendents" to supervise crews of milling, packaging, and loading operations workers.

      4.      In addition to workers and shift superintendents, DMI had a quality assurance department and employed an environmental manager. Employees in the quality assurance department were responsible for monitoring DMI's compliance with its sanitation program, which included adherence to its cleaning schedule. The environmental manager was responsible for tracking DMI's compliance with environmental laws and permits and interacting with environmental regulators and auditors.

      5.      Dust from corn milling that is exhausted to the atmosphere is regulated under the Clean Air Act as a form of particulate matter. 42 U.S.C. § 7409. DMI's corn mill was a stationary source of particulate matter under the Clean Air Act, which required it to be constructed or modified, and initially operated under the terms of

permits issued by the Wisconsin Department of Natural Resources (WDNR). DMI's WDNR-issued "air permit" required DMI to operate baghouses (also known as "filter collectors") to limit emissions of particulate matter, including corn dust. The baghouse-related permit requirements were federally enforceable by the EPA. DMI had a number of baghouses at its Cambria corn mill as part of its dust collection system. The system generally used suction to pull fine dust particles from the processing equipment through pipes that carry dust-laden air to the baghouses. Inside the baghouse, the dust-laden air was pulled by suction across filters which trapped the dust and allowed the cleaned air to pass through and out to the environment.

6. Monitoring "pressure drops" is a method of ensuring that baghouses are functioning properly. A pressure drop is a measurement of the difference in air pressure between the incoming stream of dust-laden air from the facility-side of the baghouse filter and the outgoing filtered air on the environment-facing side of the baghouse filter. Pressure drop readings that are low may indicate a possible malfunction or filter tear that allows particulate matter to pass directly through the baghouse into the environment. High pressure drop readings can indicate that the dust collection system is clogged or not collecting dust as intended.

7. DMI's air permit required DMI to monitor and record the pressure drop on each of approximately 14 baghouses every eight hours and established an acceptable pressure drop range for each baghouse. DMI created an electronic spreadsheet to log the pressure drop readings. The "baghouse log" was reviewed by WDNR inspectors and environmental auditors to help determine DMI's compliance with its air permits. The air permits also required DMI to submit to WDNR a monitoring report every six months, containing a summary of any deviations from permit conditions, and an annual certification of compliance, disclosing permit deviations and violations. The monitoring reports and annual certifications had to be certified by the designated responsible official as to the truth, accuracy, and completeness of the report, based on information and belief formed after a reasonable inquiry.

8. From at least 2015 to May 2017 DMI employees, including shift workers and shift superintendents, made false entries in the mill baghouse log. The falsifications included knowingly recording pressure differentials that appeared consistent with the specified range allowed under the air permit, when the actual observed pressure differentials were outside the allowed range. This practice resulted in many false pressure drop entries in the baghouse logs, including during the years 2015, 2016, and 2017.

9. At various times, DMI employees, communicated by email regarding backfilling blank entries for pressure drop readings in the baghouse logs.

10. On or about May 17, 2017, WDNR began an inspection to determine DMI's compliance with its air permits. During the on-site portion of the inspection the

environmental manager, showed the baghouse logs for 2015, 2016, and 2017 to WDNR inspectors, knowing the same to contain false entries and without disclosing that fact.

11. On August 16, 2017, DMI's environmental manager sent the baghouse logs for 2015, 2016, and 2017, to WDNR, knowing they contained many false pressure drop entries, and still did not disclose the false entries in the logs.

12. As a combustible dust, grain dust handled by grain industry employers was regulated by safety standards promulgated by the Occupational Safety and Health Administration (OSHA) under the Occupational Safety and Health Act (OSH Act). The Grain Handling Standard was the grain industry-specific safety standard that required employers to take actions to reduce the hazards of combustible dust in grain mills such as DMI's. The housekeeping standard within the Grain Handling Standard required DMI to "develop and implement a written housekeeping program that establishes the frequency and method(s) determined best to reduce accumulations" of fugitive grain dust. 29 C.F.R. § 1910.272(j)(1).

13. DMI's schedule of removing fugitive grain dust accumulations was principally set forth in DMI's "master sanitation schedule" (MSS). DMI maintained a MSS logbook listing each of the required cleanings and the specific dates by which the cleanings were supposed to be completed. Workers who completed cleanings were to initial and date the MSS logbook in a space provided for that purpose. Shift superintendents were to verify that each cleaning had been performed and, if so, sign and date a "superintendent sign off" entry corresponding to the cleanings. A member of the quality assurance department was to verify that the documentation procedures had been followed, and if so, sign and date as indicated in the logbook.

14. On or about May 19, 2017, DMI employees falsely initialed, signed, and dated certain cleaning entries in the MSS logbook for the week of May 1-7, 2017, giving the appearance that required dust cleanings were performed and had been verified by shift superintendents when, in fact, they had not been.

15. DMI provided the 2017 MSS logbook to OSHA on August 24, 2017, during OSHA's investigation of the May 31, 2017, explosion at the DMI corn mill.

16. The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason. The Statement of Facts is not a full recitation of the defendant's knowledge of, or participation in, the offenses.

//

//

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

By: /s Samuel Charles Lord
Trial Attorney

I, Riley Didion, am the duly authorized representative of Defendant Didion Milling, Inc. After consulting with counsel and pursuant to the plea agreement entered this day between Didion Milling, Inc., and the United States, I hereby stipulate, on behalf of Didion Milling, Inc., that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
RILEY DIDION, CEO
For Defendant Didion Milling, Inc.

I am the defendant's attorney. I have reviewed the Statement of Facts with the Defendant. To my knowledge, my client's decision to stipulate to these facts is an informed and voluntary one.

_____
Zach Fardon, Esq., Mark A. Cameli, Esq.
Attorneys for Defendant Didion Milling, Inc.

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

By: /s Samuel Charles Lord
Trial Attorney

I, Riley Didion, am the duly authorized representative of Defendant Didion Milling, Inc. After consulting with counsel and pursuant to the plea agreement entered this day between Didion Milling, Inc., and the United States, I hereby stipulate, on behalf of Didion Milling, Inc., that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
RILEY DIDION, CEO
For Defendant Didion Milling, Inc.

I am the defendant's attorney. I have reviewed the Statement of Facts with the Defendant. To my knowledge, my client's decision to stipulate to these facts is an informed and voluntary one.

_____  9.27.23
Zach Fardon, Esq., Mark A. Cameli, Esq.
Attorneys for Defendant Didion Milling, Inc.